BEAMAN-MARVELL COMPANY *vs.* ORMAN C. MARVELL &
another.

Franklin.    September 20, 1939. — February 21, 1940.

Present: FIELD, C.J., DONAHUE, QUA, DOLAN, & COX, JJ.

*Equity Pleading and Practice*, Counterclaim. *Equity Jurisdiction*, Mistake. *Mortgage*, Of real estate: validity, discharge. *Bills and Notes*, Validity, Cancellation. *Corporation*, Officers and agents.

A cross bill in a suit in equity, filed by leave of court, was treated as a counterclaim filed under Rule 32 of the Superior Court (1932), that being its essential character.

Subsidiary findings by a master in a report confirmed by the court required conclusions that a corporation through its directors, with full knowledge of the material facts and without being misled, lawfully established the amount of a debt it owed one of its officers and caused a note, and a mortgage securing it, to be issued therefor; that such note was not unlawful in that in its principal amount was included a sum which the corporation owed to another of its officers and he owed to the payee officer; that the payee was entitled to retain a partial payment made on the note; and that a discharge of the mortgage, which the mortgagee signed for his attorney and delivered to a third person, who had recorded it, was executed and delivered without consideration and through mistake and was null and void both as a discharge and as a cancellation of the debt represented by the note.

BILL IN EQUITY, filed in the Superior Court on December 30, 1937, and afterwards amended.

From a final decree, entered by order of *Burns*, J., the defendant Marvell appealed.

*H. J. Field*, (*J. P. Leary* with him,) for the defendant Marvell.

*C. V. D. Siegel*, for the plaintiff.

DOLAN, J.   This is a suit in equity in which the plaintiff sought, in its original bill, to have a note and a mortgage of real estate given to secure its payment by the plaintiff to the defendant Marvell decreed to be null and void, and to have Marvell ordered to cancel and deliver up the note and "to discharge the said mortgage of record." The defendants answering denied, in substance, the allegations of

the bill; subsequently, by leave of the judge, they filed a cross bill alleging that they had just discovered that the mortgage involved had been discharged by the defendant Marvell by accident or mistake, and praying that it be decreed that the discharge of the mortgage was null and void, and that the mortgage be decreed as undischarged.

Under Rule 32 of the Superior Court (1932), however, it is provided in part that "The answer, without cross bill, must set up any counterclaim, against any one or more of the parties, arising out of the transaction which is the subject matter of the suit, which might be the subject of an independent suit in equity. The answer may set up (a) any counterclaim of a legal nature, against any one or more of the parties, arising out of such transaction, or (b) any counterclaim against the plaintiff alone, not arising out of such transaction, which might be the subject of an independent suit in equity. Such counterclaim shall have the same effect as a cross bill, so as to enable the court to enter a final decree in the same suit on both the original and cross claims. No cross bill shall be filed." Nevertheless, the substance of the motion for leave to file the cross bill was sufficient to bring its subject matter to the judge's attention, and "the character of a pleading or other paper filed in a cause is to be determined from its essential substance and not from its descriptive title or name," *Universal Adjustment Corp.* v. *Midland Bank, Ltd., of London,* 281 Mass. 303, 328, and cases cited, and we think that the so called cross bill should be treated as an amendment to the defendant's answer setting up the defendant's cross claim.

The case was referred to a master. Objections were filed by the plaintiff and the defendants. In conformity with Rule 90 of the Superior Court (1932) the master appended to his report a summary of so much of the evidence as bore upon the exceptions of the parties. The judge allowed a motion that the report of the master be confirmed. Thereafter the plaintiff was permitted to amend its bill and to add a prayer that the sum of money paid to the defendant Marvell on account of the note be decreed to be held by him upon a resulting trust for the plaintiff, and that he be

ordered to repay it to the plaintiff. After the allowance of this amendment a formal interlocutory decree was entered overruling the exceptions of the parties to the master's report and confirming the same. No appeal was taken from this decree. See G. L. (Ter. Ed.) c. 214, § 27. A final decree was then entered that the mortgage involved was null and void, and discharged, that the note be cancelled and delivered to the plaintiff by Marvell, and that he pay to the plaintiff the money received by him on account of the note, with costs. The bill was dismissed as to the defendant L. H. Beaman. The case comes before us upon the appeal of the defendant Marvell, hereinafter referred to as Marvell, from the final decree.

Material facts found by the master follow. The plaintiff is a Massachusetts business corporation with its principal place of business in Leverett in this Commonwealth. It is and for many years has been engaged in the business of manufacturing and selling boxes, lumber and forest products and of buying and selling standing timber and timber lands. Upon its organization C. H. Beaman (hereinafter referred to as Beaman) was elected its president and treasurer and held these offices until his death on March 7, 1933. Marvell was elected vice-president and held that office until May 1, 1933, when he was elected president and treasurer. Each of these men was also a director of the corporation. From its incorporation until his death Beaman acted as general manager and was in charge of the office and of the books and records of the plaintiff corporation. Upon his death the defendant L. H. Beaman succeeded to the duties last referred to and was also elected a director on May 1, 1933. Marvell, Beaman and members of their families held a majority of the stock in the corporation. After the death of Beaman, his wife qualified as executrix of his will, but none of the stock held by him at his death was sold prior to July 21, 1933. Beaman was the most active person in the conduct of the affairs of the plaintiff. As president and treasurer he never made a written report of its financial condition to the directors or to the stockholders. He frequently took corporate action which was later ratified by

the directors.  Apart from the voting of dividends and the annual election of officers, in twenty years there were but twenty-nine recorded actions of the directors and of these the greater number consisted of ratifications of acts taken by Beaman, or of votes giving him authority to act in particular matters.  Until after the death of Beaman, action taken at directors' meetings was limited to approving minutes, electing officers, and approving reports of certain acts of Beaman as president or treasurer.  The master found that Beaman "ran" the corporation, "he was the boss.  The other directors were inclined to, and did, adopt his suggestions.  To such an extent, and in such a way, he dominated the . . . [corporation] and its directors."  However, the other directors could not be dominated to the extent of doing a thing they knew to be wrong.  They were guided by the suggestions and recommendations of Beaman when they had merely a question or felt some uncertainty, relative to a proposed corporate action.

Marvell was an owner of real estate.  He had bought and sold land and was familiar with notes and mortgages, and at the time of the trial held a few mortgages.  He kept no books but "carries things in his head; pretty well knows what people owe him and about how much."  He has done business with the plaintiff as an individual and as a member of various partnerships, in some of which Beaman was also a partner.  He sold timber and timber lands to others who in turn sold them to the plaintiff.  Except as he "pretty well knew in his head," he never knew exactly how much the plaintiff or such other persons owed him or how accounts stood between the plaintiff and such others.

In December, 1932, Beaman became afflicted with a heart disease.  Marvell called Beaman's attention "to his heart condition" and told him that the accounts "had been running quite a while" and that "he wanted to settle up." As a result Beaman prepared a set of accounts and arrived at a total of $14,796 as the amount owed Marvell by the plaintiff.  This total included an item of more than $7,000 owed by the plaintiff to Beaman or a partnership in which he was a member, and which was in turn owed by Beaman

or the partnership to Marvell. No assignment was ever made by Beaman or the partnership to Marvell of any account due from the plaintiff.

Beaman, without a vote of the directors or stockholders of the plaintiff, gave to Marvell a note of the plaintiff for $14,796. This action was never expressly affirmed or ratified in terms by the corporation prior to Beaman's death. However, on April 4, 1933, in pursuance of a vote of the directors, interest was paid on the note, and on July 21, 1933, by authority of a vote of the directors, a note for $12,650 was executed and given to Marvell by the plaintiff in place of the note formerly given to him by Beaman, and a mortgage of real estate of the plaintiff was given to Marvell as security for the payment of the note for $12,650. The amount of this note was reached by a correction of accounts of the plaintiff since December, 1932. The mortgage was recorded on July 31, 1933. This action of the directors was not taken until after two of the directors had examined its books and public accountants had been retained to examine them, in accordance with a vote of the directors, and had reported.

The master also found that the records of the plaintiff were so incomplete that it was impossible to determine the true accounts between the plaintiff and Marvell before the reckoning made by Beaman in December, 1932; and that this reckoning was an account stated between the parties. The report recites that the most the master could do was to leave the parties in the position in which they put themselves on July 21, 1933 — the day the note for $12,650 and the mortgage were executed in pursuance of the vote of the directors and delivered to Marvell. It is agreed that of the principal sum of the note, $5,650 has been paid by the plaintiff together with interest to December 6, 1933. When the votes to pay interest and to give the note and mortgage to Marvell were passed, Marvell and the defendant Beaman were in active control and management of the plaintiff, they and their families holding a majority of its stock. Marvell, however, did not participate in these votes, and all the other directors voted in favor of the payment of his claims and of

giving the note and mortgage therefor.  The master specifically found that "The note, secured by mortgage, of July 21, 1933, must stand as representing the amount then owed."

Part of the money paid on account of the note by the plaintiff was received by it in consideration of a sale to the metropolitan water commission of one of the lots of land included in the mortgage.  Marvell was authorized by the directors of the plaintiff to execute and deliver the deed to the commission.  One Field, an attorney at law, prepared the deed as well as a partial release of the mortgage releasing the lot involved from his (Marvell's) mortgage which Marvell executed and acknowledged.  Mr. Field delivered both instruments to the commission which then paid for the property.

No other part of the mortgaged lands was ever taken by or sold to the commission, but, a few days after the transaction just described, attorneys for the commission at the request of Mr. Field, sent to him, "with six or eight other papers," an unsigned discharge of Marvell's mortgage.  There was no evidence that Marvell requested Mr. Field "to do" this.  Marvell did have some talk with Mr. Field about signing the discharge (the master, however, states that "there was no evidence as to the specific words"), and did execute it, and it was returned with the other papers by Mr. Field to the attorneys for the commission.  A fair reading of the record indicates that these attorneys recorded the discharge, and that it was returned to them after having been recorded.  It was in their possession at the time of the hearing before the master.  Although it recites that Marvell acknowledges satisfaction, Marvell in fact received nothing at the time he executed it or thereafter on account of the balance then due.  The commission had no reason to require or record this discharge, since its only interests had been fully protected by the partial release previously executed and delivered to it.

The master found that Marvell was an intelligent man, of much business experience, very familiar with notes and mortgages and that, after conversation with his lawyer

relating to the execution of the discharge, knew what he was doing and that the discharge was not executed by mistake; that the mortgage was discharged and that by his acts in discharging the mortgage "Marvell cancelled and discharged the indebtedness of the petitioner to him and to . . . Beaman." While it thus appears that the master in his ultimate findings recognized the existence of the debt evidenced by the note and mortgage and simply found that the indebtedness had been cancelled and discharged by the discharge of the mortgage, the final decree not only perpetually enjoined Marvell from bringing any "suit either in law or in equity . . . to enforce any claim arising out of or concerning" the note involved, with other orders appropriate to that relief, and decreed that the mortgage involved was null and void and "forever discharged," but also decreed that "the defendant Marvell holds the sum of" $7,500 "received by him from the plaintiff corporation on account of the mortgage and note hereinbefore referred to, in trust for the benefit, and in favor of, the plaintiff and he is hereby ordered and directed to pay over to the plaintiff corporation within thirty days, the sum of" $7,500 "with interest or a total of" $8,211.25. Since the ultimate finding of the master that "the note, secured by mortgage, of July 21, 1933, must stand as representing the amount then owed," is consistent with the subsidiary findings of the master in respect to the note and mortgage and so must prevail, we are of opinion that so much of the decree as orders the repayment by Marvell to the plaintiff of the sums paid to him by the plaintiff on account of the note is erroneous.

The contentions of the plaintiff that it has never been determined that it owed anything to Marvell or Beaman or any of the partnerships in which they were members on or before December, 1932, and that at least part of the debt for which the plaintiff's note was given was Beaman's personal debt to Marvell and therefore the note was without consideration, fraudulent in its inception and *ultra vires* the corporation, are not supported by the findings of the master. We have already pointed out that the master

found that the account drawn up by Beaman showed the sum due from the plaintiff to Marvell was $14,796, and that this sum included $7,404.82 owed by the plaintiff to Beaman or to a partnership in which he was a member, and which in turn owed this sum to Marvell. This was a statement and an admission of a debt of the plaintiff made by its president and treasurer. The note now involved was given by authority of a vote of the directors of the plaintiff, and in correction of and in substitution for the one formerly given by Beaman, in circumstances already described, to Marvell. The master, as before stated, found specifically that it is impossible to determine precisely how much was due to Marvell, and that the parties should be left in the position in which they put themselves and expressly found that the note must stand as representing the amount due when it was executed and delivered to Marvell. It is thus clear that a debt was due from the plaintiff to Marvell, and that the compromise sum was adopted by the directors in voting to give to Marvell the note now in question, secured by the mortgage.

When Beaman prepared the account and gave Marvell the original note it would appear that he was attempting to pay Marvell not only the sum owed Marvell by the plaintiff but also the sum owed by the plaintiff to Beaman or to a partnership of which he was a member; which in turn owed to Marvell the sum due from the plaintiff to Beaman or the partnership. The master in effect so found when he stated that Marvell cancelled the indebtedness of the plaintiff to him and to Beaman. The transaction in effect was the payment of two of the plaintiff's creditors, by which the plaintiff was not harmed. In any event, the votes of the directors to pay interest and to give the new note and mortgage and to make payments on account of the principal sum due on the note were ratifications of Beaman's acts, except as the new note was for a lesser sum. Even if the note was in payment of the two debts due from the plaintiff, the transaction was proper, and the plaintiff's contentions of fraud and *ultra vires* fail. The master has in fact found, without impugning the integrity of the other

directors, that three (a majority) of the directors were men of probity who "could never be dominated by anyone to the extent of affirmatively doing a thing they knew to be wrong . . . [that] where they had merely a question or uncertainty about a corporate action, they were guided by the suggestion and recommendation of . . . Beaman." In this connection it is to be noted that when the directors voted to give the note and mortgage to Marvell, any influence of Beaman in this respect was not operative since the action was taken after his death. Moreover, it was not taken until after the defendant Beaman and one of the directors of the plaintiff had examined the plaintiff's books, and after an audit had been made by certified public accountants in accordance with a vote of the directors, and report had been made to them by the accountants. It is manifest that the directors in voting to give Marvell the note and mortgage had full knowledge of the facts, were not misled by misrepresentation or other fraud, and that their action was valid, since it was within their power to provide for the payment of the plaintiff's debts. See *Murray* v. *C. N. Nelson Lumber Co.* 143 Mass. 250, 251.

The question remains whether the balance of the debt of the plaintiff to Marvell on account of the note, which is still unpaid, was cancelled by the discharge of the mortgage. The ultimate findings of the master in this respect are that Marvell, "With his years of experience, with his familiarity with mortgages, after talking about it with his lawyer, of which talk there was no evidence as to the specific words, within eight days after executing the partial release of the Briggs lot . . . executed the discharge of his mortgage." The master states: "From the facts herein found, I find that he knew what he was doing when he executed the discharge of mortgage and . . . did not execute it by mistake"; and that "In doing the acts or things which I herein find that he has done," Marvell cancelled the indebtedness of the plaintiff "to him and to Charles H. Beaman."

It thus appears that we have before us as a foundation all that the master had before him concerning this subject matter, and hence we may draw our own inferences from

the subsidiary facts found by him. The subsidiary facts found disclose that at the time Marvell discharged the mortgage he did so in connection with the transactions had between his attorney and the attorneys representing the water commission in the sale to the latter of the Briggs lot as to which it is true Marvell had already executed a partial release. Nevertheless this unsigned discharge was sent to Marvell's attorney together with other papers by the attorneys for the commission. It was respecting the return of these papers that Marvell was conferring with his attorney when he executed the discharge. What the conversation was between Marvell and his attorney relative to the discharge does not appear. In this connection the master simply finds that "there was no evidence as to the specific words." There was no reason why Marvell should execute the discharge of the mortgage, or why it should be sent by his attorney to the attorneys for the water commission, who would have no interest in recording it, but did in fact do so and apparently retained the discharge to the time of trial. Marvell received nothing from the plaintiff or from the water commission when he executed the discharge. On December 27, 1937, Marvell, who had retained the note, went to the plaintiff's office and asked if he could get some money. He "was told the . . . [plaintiff] had no money." He asked "if he had to foreclose his mortgage and sue for the rest." None of the present officers of the corporation knew of the existence of the discharge until after this suit was begun. There is no finding that any officer of the plaintiff ever knew of the existence of the discharge except Marvell, who was the president and treasurer of the plaintiff when he executed the discharge. The record discloses that when the present suit was brought Marvell himself was not conscious that the mortgage had been discharged.

The inference which we draw from the subsidiary findings of the master is that the mortgage was discharged by mistake.

"It is the general rule that, where a mortgage has been discharged by mistake, equity will set the discharge aside and reinstate the mortgage to the position the parties in-

tended it to occupy, where the rights of intervening lienors have not been affected." *North Easton Co-operative Bank* v. *MacLean*, 300 Mass. 285, 292, and cases cited. Here no rights are concerned except those of the parties to the mortgage. It follows that the defendant Marvell is entitled to the relief sought in the cross claim.

The final decree entered in the Superior Court is reversed and a decree is to be entered dismissing the plaintiff's bill with costs, and on the defendant Marvell's cross claim a decree is to be entered that the discharge of the mortgage was executed and recorded by mistake, and did not prove an actual payment of the mortgage debt or cancel or discharge the mortgage, but was inoperative and voidable, and that the mortgage is in force and effect as before the discharge, and that the plaintiff corporation and all persons claiming by, through or under it be prohibited and enjoined from setting up, using or relying upon the discharge either as proof of payment of the debt or a discharge of the mortgage. (See *Bruce* v. *Bonney*, 12 Gray, 107, 113; G. L. [Ter. Ed.] c. 184, § 17.)          *Ordered accordingly.*